Filed 10/31/22  In re L.H. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

|  |  |
|---|---|
| In re L.H. et al., | B318400 |
| Persons Coming Under the Juvenile Court Law. | (Los Angeles County Super. Ct. No. 19CCJP06482) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| KARLA B., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Mary E. Kelly, Judge.  Affirmed.

Jacob I. Olson, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Veronica Randazzo, Deputy County Counsel, for Plaintiff and Respondent.

———————————

Karla B. (Mother) appeals from the juvenile court order terminating her parental rights to her children L.H., J.H., J.H. Jr., G.H. and A.H. (children) pursuant to Welfare and Institutions Code[1] section 366.26. The children's father is J.H., Sr. (Father).[2]

Mother contends the Los Angeles County Department of Children and Family Services (DCFS) did not adequately investigate each child's potential status as an "Indian child" as defined in the Indian Child Welfare Act (ICWA; 25 U.S.C. § 1901 et seq.). She specifically contends that DCFS had a duty under section 224.2, subdivision (b) and California Rules of Court, rule 5.481(a)(1) to inquire of "extended family members" whether the children had any possible tribal affiliation, and that DCFS failed to fulfill its duty by not inquiring of the maternal grandmother, paternal grandmother, and a paternal aunt. She further contends that DCFS's failure to perform an adequate investigation was prejudicial, and she asks this court to remand the matter to the juvenile court to conduct a new section 366.26 hearing in conformity with ICWA and related California law.

DCFS contends that substantial evidence supports the juvenile court's determination that ICWA did not apply to the

---

[1] Subsequent unspecified statutory references are to the Welfare and Institutions Code.

[2] Father is not a party to this appeal.

2

children. It further argues that any error was harmless because the record does not demonstrate that any inquiry of extended family members would bear meaningfully on the question of whether the children are Indian children.

In light of the facts in the record, which include both Mother's and Father's denials of affiliation with any Native American tribe, the ongoing contact Mother and Father had with paternal grandmother, maternal grandmother and paternal aunt, efforts by Mother, Father, paternal grandmother and paternal aunt to have the children placed with paternal grandmother and paternal aunt, and the lack of any information from maternal grandmother, paternal grandmother and paternal aunt regarding any possible tribal affiliation, we conclude additional inquiry of extended relatives would not have yielded information that was likely to bear meaningfully on the question of whether the children are Indian children under ICWA. Accordingly, any failure to inquire of extended family members was harmless.

We thus affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Dependency Proceedings[3]

1. *Petition and Detention Regarding L.H., J.H., J.H. Jr., and G.H.*

In September 2019, when Mother gave birth to G.H., both she and the baby tested positive for amphetamine. At that time,

---

[3] Because the sole issue on appeal is whether DCFS has complied with its duty of inquiry under ICWA-related California law, our summary of the dependency proceedings is abbreviated and focused on the facts relevant to DCFS's duty to inquire regarding the children's potential status as Indian children.

Mother had three other children—L.H. (aged 4), J.H. (aged 3) and J.H. Jr. (aged 2).[4] Both Mother and Father claim that Father is the biological father of all four children.

DCFS was notified of the positive amphetamine results, and emergency response social workers went to the hospital the day after the birth and met with Mother. Mother admitted that she had used methamphetamine two days before G.H.'s birth; she claimed it was the first time she had used the drug, and that she found it in Father's wallet.

Mother stated that she, Father, and the children had been living with paternal grandmother Maria H. since February 2019. Mother indicated that two paternal uncles, Daniel M. and Oscar V., also lived in paternal grandmother's home. Mother said that maternal grandmother Maria V. assisted with childcare for at least J.H. and J.H. Jr. Mother reported that she considers maternal grandmother as her support.

At the hospital, Mother and the social workers agreed to a safety plan under which the children would be cared for by maternal grandmother; Father was contacted by telephone and agreed. The following day a social worker met with maternal grandmother, who agreed to participate in the safety plan and indicated she wanted to be considered as a placement option for the children.

During Father's first interview with DCFS, he reported that he, Mother, and the children's paternal grandfather lived in

---

[4] Mother gave birth to a fifth child, A.H., in September 2020; L.H., J.H., J.H. Jr., G.H. and A.H. are the subjects of this case. Mother gave birth to a sixth child in November 2021; that child is not a subject of this case.

the family home. He said that paternal grandmother and the paternal uncles had moved out of the home two months earlier. He identified paternal grandmother as his family support and identified paternal grandmother as a possible placement option for the children.

Paternal grandmother informed DCFS that she ended her relationship with paternal grandfather and left the family home about two months earlier. She previously lived with paternal grandfather along with Mother, Father, and their children. Paternal grandmother confirmed she was living with the two paternal uncles, Daniel and Oscar. Paternal grandmother indicated that she would be willing to care for the children.

On October 1, 2019, DCFS informed maternal grandmother that, because she had been involved in dependency proceedings as a mother, DCFS would not place the children in her care. The next day, October 2, Mother took the children to paternal grandmother's residence. DCFS obtained Mother's and Father's consent to detain L.H., J.H., J.H. Jr. and G.H., and placed them with their paternal grandmother.

On October 4, 2019, DCFS filed a section 300 petition on behalf of L.H., J.H., J.H. Jr. and G.H., based on allegations that G.H. was born positive for amphetamine, that Mother and Father both had a history of substance abuse and continued to abuse drugs, and that they had been involved in an incident of domestic violence.

On October 7, 2019, the juvenile court held a detention hearing, at which it found a prima facie case that L.H., J.H., J.H. Jr. and G.H. were children described under section 300 and detained the children outside of the parents' custody. The

5

juvenile court also found Father to be the presumed father of the four children.

On November 15, 2019, DCFS filed a combined jurisdiction/disposition report, in which it indicated that the children remained in the care of paternal grandmother. According to the report, L.H. told the social worker that her parents were living with her maternal grandparents. Paternal grandmother told the social worker that the children were living with her and her two sons, Daniel and Oscar, and that Mother and Father had participated in monitored visits with the children at her residence. Paternal grandmother also stated that she had two other children, Mayra H. and Cristina L.

Mother informed the social worker that she was raised by maternal grandmother along with her siblings and extended relatives in the family home. Mother said she maintained a close relationship with maternal grandmother and her siblings and identified maternal grandmother as her support system. Father identified the paternal grandparents as his support system.

At the adjudication hearing held on December 10, 2019, Mother and Father pled no contest to DCFS's section 300 petition, as amended. The court declared L.H., J.H., J.H. Jr., and G.H. dependents of the court, removed them from parental custody, and ordered DCFS to provide family reunification services including monitored visits.

On May 20, 2020, in a status report, DCFS indicated that the children remained with paternal grandmother, and that paternal grandmother's home had been approved under the Resource Family Approval (RFA) program. According to the report, Mother visited the children three times a week and Father separately visited twice a week, all at paternal

6

grandmother's residence. Mother and Father both indicated that, should they not be allowed to reunify with the children, they wanted the children to remain in the care of paternal grandmother.

2. *Petition and Detention Regarding A.H.*

In September 2020, Mother gave birth to her fifth child, A.H. A DCFS social worker met with Mother and Father at the hospital the day after the birth and informed them that DCFS had placed a hospital hold on the baby and was removing A.H. from their custody. DCFS placed A.H. in the care of a paternal aunt, Cristina L., who lived at a different address than paternal grandmother. A social worker visited the paternal aunt's residence four days after the birth and the paternal aunt picked up A.H. from the hospital on that day.

On September 15, 2020, DCFS filed a section 300 petition on behalf of A.H. based on the same allegations of drug use and domestic violence supporting the section 300 petition regarding the other children.[5] According to a detention report filed by DCFS, Mother told a social worker at the hospital that she was staying with two of her siblings at their residence. Both Mother and Father told the social worker that Father was the biological father of A.H.

On September 18, 2020, the juvenile court held a detention hearing, at which it found a prima facie case that A.H. was a child described under section 300 and detained A.H. outside of

---

[5] A nurse at the hospital reported to social workers that A.H.'s medical records showed he had a heart murmur that was attributed to Mother's substance abuse.

7

the parents' custody. Mother and Father were not present at this hearing.

On September 22, 2020, Mother and Father appeared in the juvenile court for the first time related to A.H.'s dependency petition. The juvenile court found that Father was the presumed father of A.H. The juvenile court ordered that A.H. remain detained outside of the parents' custody.

In a combined jurisdiction/disposition report, filed on November 30, 2020, DCFS reported that A.H. remained in the care of paternal aunt Cristina L. Mother and Father had separate monitored visits with A.H.; the visits took place at the paternal grandmother's residence along with the other four children.

On December 10, 2020, the juvenile court sustained the allegations of DCFS's section 300 petition, as amended, and found that A.H. was described by section 300, subdivisions (b)(1) and (j), due to the parents' substance abuse and domestic violence. The court declared A.H. a dependent of the court, removed him from parental custody, and ordered DCFS to provide family reunification services including monitored visits.

3. *Status Review Hearings and Termination of Parental Rights with Respect to L.H., J.H., J.H. Jr., G.H. and A.H.*

On February 25, 2021, in a status report, DCFS indicated that L.H., J.H., J.H. Jr. and G.H. remained with paternal grandmother. According to the report, on October 28, 2020, social

workers met with Mother, Father, paternal grandmother,[6] paternal aunt and paternal uncle Daniel "to discuss the case." Both Mother and Father continued to have monitored visits with L.H., J.H., J.H. Jr. and G.H.

On May 24, 2021, in a status report, DCFS indicated that A.H. remained in the care of paternal aunt Cristina L., and that the paternal aunt's home had been approved under the RFA program in February 2020. Paternal aunt and her partner indicated that they were willing to adopt A.H. DCFS recommended adoption by paternal aunt and her partner. Mother and Father had visits with A.H. monitored by paternal aunt. The report discussed conflicts between Mother with her in-laws—paternal grandmother and paternal aunt—during visits; DCFS indicated it was considering having maternal grandmother serve as a monitor during visits. According to the report, Mother declined Sunday visits because she was busy helping maternal grandmother take care of other family members.

On June 10, 2021, at a combined six-month review hearing for A.H. and 12-month review hearing for L.H., J.H., J.H. Jr., and G.H., the juvenile court found that Mother had minimally complied with her case plans and made minimal progress towards mitigating the causes necessitating placement. The court found by clear and convincing evidence that mother failed to participate in the court-ordered treatment programs. The court found no substantial probability of any of the children being returned to Mother or Father within six months, ordered family

---

[6] This individual was identified as "MGM," i.e., maternal grandmother, but it is clear from the name used and the context that the individual was paternal grandmother.

reunification services for the parents terminated, and scheduled a section 366.26 hearing for all five children. Mother's counsel requested the juvenile court to direct DCFS to consider maternal grandmother as a monitor for visits.

In November 2021, Mother gave birth to her sixth child with Father. The child tested positive for methamphetamine; Mother admitted to having used methamphetamine during the pregnancy.

On November 23, 2021, DCFS submitted a report to the juvenile court in preparation for the section 366.26 hearing regarding L.H., J.H., J.H. Jr. and G.H. According to the report, a social worker monitored a visit between all five children (L.H., J.H., J.H. Jr., G.H. and A.H.) and maternal grandmother, three maternal aunts and a maternal uncle. Maternal grandmother declined to serve as a monitor for future visits but expressed interest in having future visits with the children. DCFS believed the best permanency plan for L.H., J.H., J.H. Jr., and G.H. was adoption with the paternal grandmother. The paternal grandmother expressed that she wanted to adopt the children, the RFA program application for the paternal grandmother had been approved, and she was identified as the prospective adoptive mother.

DCFS filed a separate report regarding A.H. A.H. remained with paternal aunt Cristina L., although in September 2021 Cristina L. had moved in with paternal grandmother. According to the report, paternal aunt Cristina L. was interested in adopting A.H., and DCFS identified her as a prospective

10

adoptive parent, but her current home was not approved under the RFA program.[7]

On February 1, 2022, DCFS filed an addendum report in which it indicated that the RFA program evaluation for paternal aunt Cristina L. at her new temporary residence had been approved on January 18, 2022. DCFS reported that it could move forward with adoption by paternal aunt after the juvenile court terminated the parental rights of Mother and Father.

On February 3, 2022, the juvenile court held the section 366.26 hearing regarding L.H., J.H., J.H. Jr., G.H. and A.H.[8] The juvenile court found the children were adoptable and no exception to termination of parental rights applied, and therefore terminated Mother's and Father's parental rights. The juvenile court designated paternal grandmother as L.H.'s, J.H.'s, J.H. Jr.'s, and G.H.'s prospective adoptive parent and it designated paternal aunt Cristina L. as A.H.'s prospective adoptive parent.[9]

Mother filed a timely notice of appeal on February 3, 2022.

---

[7] Paternal aunt's prior home had been approved, but paternal aunt had separated from her partner, who had been a co-applicant, and she was in the process of applying as a sole applicant.

[8] Neither Mother nor Father appeared at the hearing, which was held remotely. Mother's counsel requested a continuance, indicating Mother was aware of the hearing and wanted to attend, but counsel's calls to Mother's phone went directly to voicemail. The juvenile court denied the request.

[9] The juvenile court also denied a section 388 petition Mother had filed.

## B.    ICWA Inquiry and Findings

With its section 300 petition regarding the four older children, DCFS submitted Indian Child Inquiry Attachment (ICWA-010(A)) forms indicating that Mother and Father were interviewed in-person and that "[t]he child has no known Indian ancestry."  In addition, Mother filed a Parental Notification of Indian Status (ICWA-020) form (rev. Jan. 1, 2008) pertaining to L.H., J.H., J.H. Jr., and G.H.[10]  Mother checked the box next to the statement:  "I have no Indian ancestry as far as I know." Father filed separate ICWA-020 forms (rev. Jan. 1, 2008) for L.H., J.H., J.H. Jr., and G.H.  On each respective form, Father checked the box next to the statement:  "I have no Indian ancestry as far as I know."

On October 7, 2019, at the detention hearing regarding the four older children, both Mother and Father stated on the record that they were not aware of any potential Native American ancestry.  The juvenile court found "[b]ased on the parents' beliefs," there was no reason to believe the children were subject to ICWA.[11]  The juvenile court's minute order states that the

---

[10] The ICWA-020 form advises parents, "You must provide all the requested information about the child's Indian status by completing this form.  If you get new information that would change your answers, you must let your attorney, all the attorneys on the case, and the social worker . . . know immediately and an updated form must be filed with the court."

[11] At the hearing, the juvenile court probed Mother's and Father's denials of Native American ancestry, explaining to them "I'm obliged to just do a little bit of inquiry just to ask you do you—what is that based on?  Did you ever have a discussion with your family about where you came from?" and further stating,

12

"[p]arents are to keep [DCFS], their [a]ttorney and the [c]ourt aware of any new information relating to possible ICWA status."

In its combined jurisdiction/disposition report regarding the four older children, DCFS reported that both Mother and Father denied having any Native American ancestry.

On September 15, 2020, DCFS filed a section 300 petition regarding A.H. and attached an Indian Child Inquiry Attachment (ICWA-010(A)) form indicating an Indian child inquiry was made, and A.H. had "no known Indian ancestry." The ICWA-010(A) form reflected that mother was interviewed on September 11, 2020; there is no indication that Father was interviewed.

On September 22, 2020, at a hearing regarding A.H.'s detention, the juvenile court stated that both parents indicated that they had no Native American ancestry in their family lineage and found there was no reason to believe A.H. was subject to the ICWA statute.[12] Both parents appeared at the hearing, but neither objected to the juvenile court's finding or provided any contrary information.

_____

"like where your grandparents came from, what country they came from. We're obliged to find out if anybody has any Native American ancestry, so I'm supposed to find out from you if you've had any discussions with your family about where you're from to see if there's any potential that you have Native American ancestry." Both Father and Mother responded no.

[12] Father filed an unsigned ICWA-020 form (rev. Mar. 25, 2020) wherein the box next to the statement "None of the above apply" was checked. Mother did not file an ICWA-020 form; the minute order states that "[c]ounsel for the mother will submit paperwork for parentage, ICWA and JV-140 at a later date. Court accepts counsel[']s representations on the record."

13

On December 13, 2021, in conjunction with dependency proceedings regarding their sixth child,[13] Mother and Father filed separate Parental Notification of Indian Status (ICWA-020) forms in the juvenile court, in which they denied any circumstances suggesting the child was an Indian child.[14]

On June 16, 2022, in a report filed in anticipation of the section 366.26 hearing regarding Mother's and Father's sixth child, DCFS indicated that on June 15, 2022, paternal aunt Cristina L. and a second paternal aunt, Mira H.,[15] denied that the family had any Native American ancestry.

## DISCUSSION

The juvenile court and DCFS "have an affirmative and continuing duty to inquire whether a child for whom a [section 300] petition . . . has been filed, is or may be an Indian child."[16]

---

[13] On August 18, 2022, DCFS filed a motion for judicial notice and to receive additional evidence on appeal, with attached documents filed in dependency proceedings regarding Mother's and Father's sixth child. We granted the motion on August 25, 2022.

[14] Father's form was the version revised January 1, 2020; he did not check any of the boxes stating circumstances that might suggest the child is an Indian child. Mother's form was the version revised March 25, 2020; she checked the box marked "None of the above apply."

[15] This is presumably the same paternal aunt identified in an earlier DCFS report as "Mayra H."

[16] An "Indian child" is an unmarried person under 18 years of age who is (1) a member of a federally recognized Indian tribe or (2) is eligible for membership in a federally recognized tribe

(§ 224.2, subd. (a).)  In addition, Mother contends that DCFS had an express duty under section 224.2, subdivision (b)[17] and California Rules of Court, rule 5.481(a)(1)[18] to inquire of "extended family members" whether the children might be Indian children.  Under ICWA, the term "extended family member" is "defined by the law or custom of the Indian child's tribe or, in the absence of such law or custom, shall be a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law,

---

and is the biological child of a member of a federally recognized tribe.  (25 U.S.C. § 1903(4) & (8); see § 224.1, subd. (a) [incorporating federal definition under state law].)  "Being an 'Indian child' is thus not necessarily determined by the child's race, ancestry, or 'blood quantum,' but depends rather 'on the child's political affiliation with a federally recognized Indian Tribe.' (81 Fed.Reg. 38801–38802 (June 14, 2016) . . . ." (*In re Austin J.* (2020) 47 Cal.App.5th 870, 882.)

[17] Section 224.2, subdivision (b) provides that "[i]f a child is placed into the temporary custody of a county welfare department pursuant to [s]ection 306 . . . , the county welfare department . . . has a duty to inquire whether that child is an Indian child[ that] includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled."

[18] As of January 1, 2020, California Rules of Court, rule 5.481(a)(1) imposes a duty on a party seeking, among other things, termination of parental rights to "ask . . . extended family members . . . whether the child is or may be an Indian child."

niece or nephew, first or second cousin or stepparent." (25 U.S.C. § 1903(2).)[19]

Mother contends that DCFS breached its duty of inquiry by not asking the maternal grandmother, paternal grandmother and paternal aunt Cristina L. regarding the children's potential status as Indian children despite having contact with these relatives. She further contends that the failure to conduct this inquiry was prejudicial.

We conclude that Mother has not demonstrated that any error by DCFS in conducting inquiries into the children's potential status as Indian children was prejudicial. This conclusion is dispositive of her appeal.

As our prior decisions make clear, DCFS's failure to inquire of extended family members does not result in automatic reversal. (See *In re A.C.* (2022) 75 Cal.App.5th 1009; *In re S.S.* (2022) 75 Cal.App.5th 575, 581; *In re Darian R.* (2022) 75 Cal.App.5th 502.) Instead, we must examine the record and reverse or remand only if that review shows prejudice because there was "information that was likely to bear meaningfully upon whether the child is an Indian child."[20] (*In re Darian R., supra,*

---

[19] Federal regulations implementing ICWA require that state courts, "at the commencement of the proceeding," "ask each participant in an emergency or voluntary or involuntary child-custody proceeding whether the participant knows or has reason to know that the child is an Indian child." (25 C.F.R. § 23.107(a) (2022).) State courts must also "instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child." (*Ibid.*)

[20] Because federal law does not impose a duty on social workers to inquire of extended family members about tribal

16

at p. 509, quoting *In re Benjamin M., supra,* 70 Cal.App.5th at p. 744.)

In *In re S.S., supra,* 75 Cal.App.5th 575, where a mother appealed a termination of her parental rights, we considered whether DCFS's failure to inquire of the maternal grandmother was prejudicial, based on the mother's contention that social workers should have asked the maternal grandmother about the child's tribal affiliation. (*Id.* at p. 582.) We held that DCFS's failure to inquire of the maternal grandmother was harmless because she, the mother's counsel and the child's counsel all had "a strong incentive to bring to the court's attention any facts that suggest that [the child] is an Indian child" and "[t]heir failure to do so implies that the maternal grandmother is unaware of such facts."[21] (*Ibid.*)

---

affiliation, any error would be under state law. (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 742; *In re A.C.* (2021) 65 Cal.App.5th 1060, 1069.) The usual test for prejudicial state law error is whether, " 'after an examination of the entire cause, including the evidence,' " we are "of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836; see *In re Benjamin M., supra,* at p. 742 [*Watson* standard applies to agency's failure to comply with initial duty of inquiry under California's ICWA-related law].)

[21] The maternal grandmother and counsel for the mother and child all had an incentive to have the child identified as an Indian child because they all requested that the court consider placing the child with the maternal grandmother and that result would be more likely if the child were identified as an Indian child under ICWA, which provides that "preference shall be

17

In *In re Darian R.*, *supra*, 75 Cal.App.5th 502, we found that DFCS's failure to inquire of the children's maternal grandfather and maternal aunt was error, but that the error was harmless because both parents denied Indian ancestry, "mother lived with maternal grandfather and aunt during the dependency proceedings, and she was under court order to continue to provide information relevant to ICWA" (*id.* at pp. 509, 510), and thus "it was unlikely that any further inquiry of family members would have yielded information about Indian ancestry." (*Id.* at p. 504.)

In *In re A.C.*, *supra*, 75 Cal.App.5th 1009, we concluded that DCFS's failure to ask extended family members about possible tribal affiliation was prejudicial, because the "mother, as a foster care product, may not know her cultural heritage, but her biological relatives may have that information," and "although a detention report indicated [the child] may be an Indian child, the record is devoid of any followup on that representation." (*Id.* at p. 1017.) In that case, the children were placed with multiple maternal aunts and a maternal cousin, but there was no indication that DCFS interviewed any of these relatives about the child's potential Indian heritage. (*Id.* at p. 1013.)

Here, Mother does not point to any facts in the record that support her contention that inquiring of maternal grandmother, paternal grandmother, or paternal aunt Cristina L. would have yielded information likely to bear meaningfully on the court's ICWA determination. Our own review of the record confirms there are no such facts.

---

given, in the absence of good cause to the contrary, to a placement with [¶] . . . [¶] . . . a member of the Indian child's extended family." (25 U.S.C. § 1915(a) & (b)(i).)

18

First, Mother and Father consistently informed DCFS and the juvenile court that they were unaware of any information suggesting the children might be Indian children. Mother informed DCFS of this when she was interviewed at the hospital the day after giving birth to G.H., and Father informed DCFS when he was interviewed two days later. Then, prior to the detention hearing for the four older children, both Mother and Father submitted Parental Notification of Indian Status (ICWA-020) forms indicating they had "no Indian ancestry as far as I know." At the detention hearing, both parents stated on the record that they were unaware of any Native American ancestry. During its further investigation, DCFS asked both parents again and they denied being aware of any information suggesting the children might be Indian children. When DCFS interviewed Mother the day after A.H. was born, she stated that A.H. had no known Native American ancestry. Soon after, Father filed an ICWA-020 form (rev. Mar. 25, 2020) indicating he was unaware of any information suggesting A.H. was an Indian child. At the detention hearing for A.H., the juvenile court stated that the parents both denied having any Native American ancestry, and neither Mother nor Father objected or provided any contrary information.

Second, Mother and Father had ongoing contact with maternal grandmother, paternal grandmother and paternal aunt Cristina L. Mother reported that she had a close relationship with maternal grandmother, and she consistently spent time with maternal grandmother during the dependency proceedings. Maternal grandmother took care of the four older children for the first few days after G.H. was born, and she expressed an interest in having the children placed with her. Mother and Father had

19

lived with paternal grandmother prior to the dependency proceedings. Early in the proceedings the four older children were placed with paternal grandmother and they remained in her care throughout the proceedings.[22] Mother and Father interacted with paternal grandmother during their visits with the children. A.H. was placed with paternal aunt Cristina L. after being released from the hospital, and he remained in her care throughout the proceedings. Mother and Father interacted with Cristina L. during their visits with A.H. Despite these repeated contacts with maternal grandmother, paternal grandmother and paternal aunt Cristina L., neither Mother nor Father ever reported that any of these extended family members had any information suggesting the children are Indian children. (See *In re Darian R.*, *supra*, 75 Cal.App.5th at p. 510 [finding error by DCFS in failing to inquire of extended family members was not prejudicial where the mother "at various times lived with the relatives she claims DCFS failed to interview"].)

Third, as this court observed in *In re S.S.*, *supra*, 75 Cal.App.5th at page 582, because preference is given to placing an Indian child with extended family (25 U.S.C. § 1915(a) & (b)), there is a strong incentive for parents and family members to bring to the juvenile court's attention facts suggesting that a child is an Indian child. Here, paternal grandmother and paternal aunt Cristina L. engaged in significant efforts to have the children placed with them. Yet no one—not Mother, Father,

---

[22] Mother and Father both supported the placement of the children with paternal grandmother.

20

their attorneys,[23] or these extended relatives—indicated that the children may be Indian children. That they did not do so implies they are unaware of facts that would bear meaningfully upon the issue. (See *In re S.S.*, *supra*, 75 Cal.App.5th at p. 582 [finding error by DCFS in failing to inquire of maternal grandmother was not prejudicial where maternal grandmother, mother's counsel and the child's counsel all requested the court consider placing the child with maternal grandmother and thus their failure to bring to the court's attention facts suggesting the child was an Indian child "implies that the maternal grandmother is unaware of such facts"].)

Parents also have an incentive to bring to the juvenile court's attention any information suggesting that a child may be an Indian child because, when termination of parental rights is sought, the juvenile court must make a finding that continued custody of the child by the parent is likely to result in serious emotional or physical damage to the child, and "under the ICWA the state must prove the detriment beyond a reasonable doubt and with a qualified expert witness, whereas under state law the

---

[23] Los Angeles County local court rule 7.17 requires parents' attorneys to ask their clients whether they have a reason to believe their child is an Indian child and to make every effort to assist in confirming the child's Indian status. (Super. Ct. L.A. County, Local Rules, rule 7.17(a), (e)(3).) Moreover, the rule requires parents' counsel to "have a complete familiarity with the facts of the case by reviewing the court file." (*Id.*, rule 7.17(e)(5).) Thus, we may reasonably infer that Mother's attorney would have been aware of the placement preferences for Indian children and motivated to assist in Mother's efforts to have the children placed with relatives. This lends further support to our conclusion that Mother fails to show prejudice.

state need only prove the detriment by a preponderance of the evidence." (*In re Matthew Z.* (2000) 80 Cal.App.4th 545, 553.) This higher burden of proof that DCFS would have faced if there had been reason to know the children were Indian children provided additional incentive for Mother to bring forward information bearing on whether the children were Indian children, and yet she did not bring forward any such information.

Finally, during dependency proceedings regarding Mother's and Father's sixth child, paternal aunt Cristina L. (and another paternal aunt) stated to DCFS that they were not aware of any tribal affiliation.[24]

---

[24] DCFS filed a motion asking us to receive this post-judgment evidence from the dependency proceedings concerning Mother's and Father's sixth child. In *In re Zeth S.* (2003) 31 Cal.4th 396, 413, our Supreme Court concluded "that consideration of postjudgment evidence of changed circumstances in an appeal of an order terminating parental rights, and the liberal use of such evidence to reverse juvenile court judgments and remand cases for new hearings, would violate both the generally applicable rules of appellate procedure, and the express provisions of section 366.26 which strictly circumscribe the timing and scope of review of termination orders, for the very purpose of expediting the proceedings and promoting the finality of the juvenile court's orders and judgment." We conclude that *In re Zeth S.* does not preclude us from granting DCFS's motion and considering this postjudgment evidence, and that consideration of this evidence is proper. The evidence does not show changed circumstances, it is not admitted to reverse the juvenile court's orders or judgment, and it supports the finality of the juvenile court's orders and judgment. (See *In re A.B.* (2008) 164 Cal.App.4th 832, 839-841 [augmenting record and considering evidence of mother's disclaimer of Native American heritage in a

In sum, it is unlikely that maternal grandmother or paternal grandmother had knowledge of a possible tribal affiliation superior to Mother's and Father's disclaimer of any such ancestry. (Cf. *In re A.C.*, *supra*, 75 Cal.App.5th at p. 1016 [where mother herself had been a product of foster care and "may not have known her cultural heritage"]; *In re Y.W.* (2021) 70 Cal.App.5th 542, 554 [remanding for ICWA inquiry in matter where appealing parent was adopted and estranged from her parents].) In addition, the record discloses that paternal aunt Cristina L. has denied being aware of any possible tribal affiliation. Accordingly, any ICWA inquiry error under section 224.2, subdivision (b) or California Rules of Court, rule 5.481(a)(1) was harmless.

_____

separate dependency proceeding to support conclusion that agency's failure to inquire under ICWA was harmless]; *In re B.D.* (2008) 159 Cal.App.4th 1218, 1240 [considering postjudgment evidence regarding children's adoption to support finding of harmless error]; *In re Salvador M.* (2005) 133 Cal.App.4th 1415, 1420-1422 [granting motion to augment record and considering postjudgment evidence of adoption of child which partly mooted the appeal]; *Alicia B. v. Superior Court* (2004) 116 Cal.App.4th 856, 867 [granting motion to augment partly because denying the motion "would be counterproductive to 'the state's strong interest in the expeditiousness and finality of juvenile court dependency proceedings' "], citing *In re Zeth S.*, *supra*, at p. 412.)

## DISPOSITION

The juvenile court's order terminating the parental rights of Mother in L.H., J.H., J.H. Jr., G.H. and A.H. is affirmed.

NOT TO BE PUBLISHED

BENKE, J.*

We concur:


CHANEY, J.


BENDIX, Acting P. J.

---

* Retired Associate Justice of the Court of Appeal, Fourth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.